## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL ANDERSON,                    )         Case No. 3:18-cv-00190
                                  )
            Plaintiff,            )         JUDGE KIM R. GIBSON
                                  )
        v.                        )
                                  )
NORFOLK SOUTHERN RAILWAY          )
COMPANY,                          )
                                  )
            Defendant.            )

## MEMORANDUM OPINION

Before the Court is "Defendant's Motion for Summary Judgment" (ECF No. 52) filed by defendant Norfolk Southern Railway Company ("NSRC") and "Plaintiff's Motion for Partial Summary Judgment" (ECF No. 55) filed by plaintiff Paul Anderson ("Anderson"). Also pending before the Court is NSRC's "Defendant's Motion to Strike the Affidavit of Timothy Laeving (ECF No. 62). The motions are fully briefed (ECF Nos. 52, 53, 61, 63, 55, 56, 58, 62, 67) and ripe for disposition. For the following reasons, the Court **GRANTS** NSRC's motion for summary judgment, **DENIES** Anderson's motion for partial summary judgment, and **DENIES** NSRC's motion to strike.

### I.      Jurisdiction and Venue

The Court has subject matter jurisdiction because Anderson's Rehabilitation Act and ADA claims arise under federal law. 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Anderson's PHRA claim because it forms part of the same case or controversy as his Rehabilitation Act and ADA claims. 28 U.S.C. § 1367. Venue is proper in this district because a

substantial portion of the events giving rise to the claim occurred in this district. 28 U.S.C. § 1391(b)(2).

## II.     Factual Background

The Court derives the following facts from a combination of NSRC's Concise Statement of Material Facts (ECF No. 54), Anderson's Statement of Material Facts (ECF No. 57), and the Parties' Briefs in Support of their Motions for Summary Judgment (ECF Nos. 52, 56).

NSRC is a freight railroad that employs approximately 24,500 people and operates more than 20,000 route miles in twenty-two states and the District of Columbia. (ECF No. 54 at ¶ 1). Anderson was employed by NSRC in 2007 as a Conductor Trainee, received a promotion to Conductor in 2008, and then another promotion to Locomotive Engineer in 2015. (*Id.* at ¶¶ 2-3). Anderson was a member of a union, and NSRC and the union maintained a collective bargaining agreement ("CBA") that included, among other provisions, seniority provisions for conductors and engineers. (*Id.* at ¶¶ 5-6). Anderson's job duties consisted of the safe and proper management of trains, often through populated areas and/or with cargo consisting of chemicals and other hazardous materials. (*Id.* at ¶¶ 7-8). Anderson's job duties also required driving locomotives, working in proximity to moving machinery, and mounting and dismounting equipment. (*Id.*). Anderson's positions of train conductor and engineer are recognized by the Federal Railroad Administration as "safety-sensitive," meaning the safety of individual employees and the public is implicated in the positions' performance. (*Id.* at ¶ 9)

In June 2016, Anderson took a medical leave of absence from work after several episodes of unexplained falls, that resulted in the loss of consciousness, head injuries, and hospitalization ("syncopal episodes"). (*Id.* at ¶¶ 12-14). Anderson was diagnosed with Brugada Syndrome, a

lifelong condition that causes disruption to the heart's normal rhythm that can result in the sudden loss of consciousness and death. (*Id.* at ¶¶ 14-16). Anderson received an automated implantable cardiac defibrillator ("ICD") as part of his treatment. (*Id.* at ¶ 16). The ICD's purpose is to shock the heart to restore its normal rhythm, and the shocks the ICD delivers can be strong enough to knock a person to the ground and cause loss of situational awareness. (*Id.* at ¶ 18-20). Anderson notified NSRC of his Brugada Syndrome diagnosis and provided medical records in July 2016. (*Id.* at ¶ 21). Upon receipt of the records NSRC's Health Services agency ("NSHS") deemed Anderson not medically qualified for the safety sensitive positions of Conductor and/or Locomotive Engineer. (*Id.* at ¶¶ 22–26).

In September 2016, NSRC referred Anderson to its Vocational Rehabilitation Services ("VRS") program to assist him in finding alternative employment for which he was qualified. (*Id.* at ¶¶ 24, 29). Anderson was also instructed to provide NSRC with updated medical records after September 2016, including work restrictions and accommodation recommendations. (*Id.* at ¶ 26). Anderson was "not interested in relocating" and refused multiple positions over two years because of his opposition to relocating. (ECF Nos. 60-1 at 96:6-23; 54-3). While Anderson initially accepted and prepared for a position as Yardmaster in Altoona, this position ultimately did not become available. (ECF No. 54 at ¶¶ 32–36). Anderson declined to be considered or subsequently withdrew from consideration for various Yardmaster and Train Dispatcher positions in various locations because of his opposition to relocating. (*Id.* at ¶¶ 37–47). Further, Anderson lacked the seniority required under the CBA for other open positions. (*Id.* at 41). 6-8). Anderson sought a Yardmaster position in Baltimore but lacked sufficient seniority under the CBA. (*Id.* at 7).

Anderson provided NSRC updated medical records in March 2017. (*Id.* at ¶ 49). Anderson's treating cardiologist, Dr. Michael Larkin wrote a letter in September 2017 stating Anderson had not had episodes of loss of consciousness since the June 2016 medical leave from work. (ECF No. 61 at 1). Dr. Larkin also stated in the letter that he "could not guarantee Plaintiff would not lose consciousness should his Brugada Syndrome cause his ICD to have to shock his heart." (ECF No. 54 at ¶ 63). NSHS's Medical Services Director, Dr. Francesca Litow, conducted a review of Anderson's medical records after his request to return to work and affirmed the prior conclusion that Plaintiff was not medically fit to return to work in the safety sensitive positions of Conductor and/or Train Engineer. (ECF Nos. 61 at 1-2; 54 at ¶¶56–58).  Anderson withdrew from the VRS program in March 2018 and started his own automotive repair business the same year. (ECF No. 54 at ¶ 66).

Anderson brought this action against NSRC, his former employer, alleging that NSRC unlawfully discriminated against him in violation of the Rehabilitation Act of 1973 (the "RA"), the Americans with Disabilities Act of 1990 (the "ADA"), and the Pennsylvania Human Relations Act (the "PHRA") when NSRC deemed Anderson medically disqualified to hold the positions of conductor and/or train engineer after he was diagnosed with Brugada Syndrome in 2016.

## III.    Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when the record evidence "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56. The party moving for summary judgment bears the initial burden of showing the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has carried such burden, the opposing party must provide more than "metaphysical doubt" regarding the material facts and cannot rely on "mere allegations or denials of its pleading."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Rather, the opposing party must highlight specific facts in affidavits, depositions, or other factual material that show "a genuine issue for trial," and that some factual basis exists upon which a reasonable jury could find for the opposing party.  *Id.*

## IV.     Discussion

NSRC makes two principal arguments in support of its Motion for Summary Judgment against on Anderson's Rehabilitation Act, ADA, and PHRA claims: (1) that NSRC conducted an individualized, thorough review of Anderson's medical records and relied on sound medical advice in deeming Anderson not medically qualified for the Conductor and/or Train Engineer positions due to his Brugada Syndrome; and (2) NSRC properly attempted to accommodate Anderson by placing him in a different position for which he was qualified, but was hampered by Anderson's job search preferences. (ECF No. 53 at 9).  Anderson seeks partial summary judgment as to NSRC's direct threat defense, contending that it failed to conduct the required individualized assessment direct threat analysis of Anderson's ability to perform the essential functions of his job.  (ECF No. 56).

### A.     The Court Grant's NSRC's Motion for Summary Judgment and Denies Anderson's Motion for Summary Judgment

"The 'substantive standards for determining liability [under the ADA and Rehabilitation Act] are the same.'"  *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021) (quoting *McDonald*

*v. Com. of Pa., Dept. of Public Welfare*, 62 F.3d 92, 95 (3d Cir. 1995)) (alteration in original).  Similarly, "[t]he PHRA is basically the same as the ADA in relevant respects, and courts 'generally interpret the PHRA in accord with its federal counterparts.'"  *Alston v. Park Pleasant, Inc.*, 679 F. App'x 169, 170 (3d Cir. 2017) (quoting *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002)).  Accordingly, the Court will evaluate Anderson's claims together.  *Gibbs*, 989 F. 3d at 229.

The ADA "prohibits covered entities from discriminating against qualified employees based on their disabilities."  *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 245 (3d Cir. 2020) (citing 42 U.S.C. § 12112).  To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must show that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."  *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

"For the purposes of the ADA, plaintiffs are disabled if they: (1) have 'a physical or mental impairment that substantially limits one or more' of their 'major life activities'; (2) have 'a record of such an impairment'; or (3) are 'regarded as having such an impairment.'"  *Eshleman*, 961 F.3d at 245 (quoting 42 U.S.C. § 12102).  Here, the parties do not dispute that Anderson satisfies the first element.[1]  However, the Court finds that Anderson has failed to establish the other elements required for his *prima facie* case.

---

[1] Anderson denies having an impairment that substantially limits one or more major life activities, and instead insists he is only regarded as having such impairment. *See* (ECF No. 53 at 11). Both circumstances qualify an individual as "disabled" under the ADA. *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 245 (3d Cir. 2020). Accordingly, the Court presumes for purposes of the motion, that Anderson has satisfied the first element of his *prima facie* case.

### 1. Anderson is not "otherwise qualified"

To establish his *prima facie* case of disability discrimination, Anderson must show that he is "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by [NSRC]." *Gaul*, 134 F.3d at 580. Ordinarily, the "[p]laintiff bears the burden of establishing that []he is a qualified individual." *Sciarrino v. Reg'l Hosp. of Scranton*, No. 3:18CV1615, 2020 WL 1244477, at *3 (M.D. Pa. Mar. 16, 2020) (citing *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 806 (1999)). However, "[t]he employer bears the burden of proving that an employee poses a direct threat." *Clark v. Southeastern Pennsylvania Transp. Auth.*, No. CIV.A. 06-4497, 2008 WL 219223, at *10 (E.D. Pa. Jan. 25, 2008), *aff'd*, 306 F. App'x 796 (3d Cir. 2009)). "An employee who is a direct threat to the safety of himself or others is not a qualified individual with a disability. Indeed, the ADA explicitly provides that permissible qualification standards may include a requirement that an individual not pose a direct threat to the health or safety of other individuals in the workplace." *Id.*

"A 'direct threat' is defined by the pertinent regulations as 'a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation.'" *Spencer v. Pennsylvania State Police*, No. 2:13-CV-1282, 2015 WL 5714411, at *7 (W.D. Pa. Sept. 29, 2015) (citing 29 C.F.R. § 1630.2(r); 42 U.S.C. § 12111(3)). In determining that an individual is a direct threat, the determination:

> shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2.  "The key inquiry when considering whether an applicant or employee poses a direct threat is not whether a risk exists, but whether it is significant."  *Spencer*, 2015 WL 5714411, at *7 (internal quotations and alterations omitted).  The Third Circuit has held that "[i]f the threatened harm is grievous, of course, even a small risk may be 'significant.'"  *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000).

The scope of Anderson's motion for partial summary judgment is limited to his contention that NSRC did not conduct an individualized direct threat analysis.  (ECF No. 56).  Anderson's sole basis of support for his contention that NSRC failed to conduct a direct threat analysis is that Dr. Francesca Litow "admitted in her deposition that she did not conduct a direct threat analysis." (*Id.* at 2) (citing Dr. Litow's deposition, (ECF No. 57-1)).  Anderson argues that because Dr. Litow did not conduct a direct threat analysis "any after-the-fact testimony is *post hac* [*sic*] and not relevant to the adverse employment decision at the time it was made." (*Id.*).  In response, NSRC argues that Anderson mischaracterizes Dr. Litow's testimony.  (ECF No. 58 at 1).

The exact exchange during Dr. Litow's deposition that Anderson points to is:

Q      Okay. Have you had – I know you have had some training under the Americans with Disabilities Act, but can you explain for this record what training you've had?

A      So an awareness of the Americans with Disabilities Act was part of my initial training in occupation medicine during residency.  As well, I was sent to a course conducted by a consortium that I think is currently called

the CWC, Center for Workplace Compliance.  It had a different name at the time, but in September of 2017 I attended a five-day course in Washington D.C. for H.R. professionals that touched on the Americans with Disabilities Act, as well as other regulations pertinent to employment.

Q       Did any of that training concern or educate you on the concept of a direct threat analysis?

A       I don't recall that specific term was used.

Q       Okay. And then would it follow that you did not perform a direct threat analysis for Mr. Anderson?

A       So I would like to know what you understand that to refer to.  I don't use that term.

Q       Okay.  Fair Enough.  So it's kind of a term that either was or wasn't addressed in your training, so if you're not familiar with that term I think the testimony stands.  But I'll just, you know, follow up just to say that – did you ever reduce to writing or discuss with anyone the safety threat and the level of safety threat specifically that Mr. Anderson would have impose [sic] to himself or others?

A       No.

(ECF No. 57-1 at 69:2–70:9).  This exchange does not stand for the proposition that Anderson argues.  It is clear from this portion of the deposition that the question to which Dr. Litow answered "no" (*Id.* at 70:9) was "did you ever reduce to writing or discuss with anyone the safety threat and the level of safety threat specifically that Mr. Anderson would have impose [sic] to

himself or others?" (*Id.* at 70:5–9). Contrary to Anderson's argument, Dr. Litow did not admit to failing to perform a direct threat analysis. Dr. Litow simply stated that she does not "use that term." (*Id.* at 69:25). On follow-up, the questioning attorney explained the term, then asked a different question, without re-asking the direct threat analysis question. (*Id.* at 70:1–8). Further, the deposition excerpt Anderson provides omits the prior question. Dr. Litow was asked if she "assess[ed] Mr. Anderson's safety risk either to himself or other people as part of [her] analysis or decision-making considering [Anderson's] return to work," to which she unequivocally answered "yes." (54-5 at 68:22–69:1); *see* (ECF No. 57-3 at 1) ("it was determined that [Anderson] w[as] neither medically fit to return to duty in the safety-sensitive positions of locomotive engineer, conductor, or vehicle/equipment operator, nor [was Anderson] medically fit to work on or around moving equipment. This determination was based upon an individualized assessment of the medical information [Anderson] provided."). Accordingly, the Court finds that Anderson has failed to support his motion for partial summary judgment and, therefore, his motion should be denied.

In addition to contesting Anderson's motion for partial summary judgment, NSRC also argues in its motion for summary judgment that it has shown Anderson "is a direct threat because it conducted an individualized assessment of [Anderson]'s condition using both current medical knowledge and the best objective evidence available during the assessment." (ECF No. 53 at 14). In support of NSRC's contention that it conducted the appropriate individualized assessment of Anderson's condition, NSRC provides an extensive narrative relating to how it assessed Anderson's condition. (*Id.* at 15–18).

The Court finds that there is no genuine dispute of material fact as to whether NSRC conducted an individualized assessment into Anderson's ability to perform the essential functions of his job.  Anderson points to Dr. Litow's deposition testimony for the proposition that a direct threat analysis was not conducted.  (ECF No. 60 at ¶ 22).  However, as addressed above, Dr. Litow's deposition statement does not state that an individualized direct threat analysis was not performed.  Anderson also contends that Dr. Litow did not consult with a cardiologist or obtain independent medical evaluation, despite it being an option.  (*Id.*).  It is unclear how not consulting with a cardiologist or obtaining an independent medical evaluation means that there was not an individualized assessment of Anderson's ability to perform his job.

Anderson also disputes the extent to which Dr. Padiyar was involved in the individualized assessment of Anderson's ability to perform the essential job functions.  (ECF No. 60 at ¶ 23).  Dr. Padiyar stated during his deposition that he did not "remember making too many decisions, if at all" after May or June 2016, and does not recall performing a medical review for Anderson.  (ECF No. 60-2 at 14:8–12, 23).

However, a letter dated September 23, 2016, was sent under Dr. Padiyar's signature to Anderson, stating that "it has been regretfully determined that [Anderson is] not fit for duty for a safety-sensitive job as a Locomotive Engineer or as a Conductor."  (ECF No. 59-1 at 2).  Whether or not Dr. Padiyar was involved in Anderson's review, it is clear that NSHS looked at his medical records and made the determination that because of his medical condition, he could not perform the essential job functions.  The declarations of Dr. Litow (ECF No. 54-1 at ¶ 10) and Nurse Euell (ECF No. 54-4 at ¶ 6) both reflect that Dr. Paula Lina assessed Anderson's medical records and determined he could not safely perform the Conductor or Locomotive Engineer positions.  Nurse

Euell's notes of her September 22, 2016 phone call with Anderson reflect that she received "notes from Dr. Michael Larkin and that [Euell] reviewed that information with the Medical Director [Dr. Paula Lina]." (ECF No. 54-4 at 5). Anderson does not dispute these declarations or notes. While it is troubling that a letter was sent under Dr. Padiyar's signature after he stopped conducting medical evaluations, that does not create a genuine dispute of material fact as to the individual determination conducted by NSRC through NSHS into Anderson's ability to perform the essential function of Conductor or Engineer.

The four factors to consider in the direct threat analysis are: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." 29 C.F.R. § 1630.2(r). Upon consideration of the objective evidence, the Court finds that these factors support the finding that Anderson was a direct threat and, therefore, not otherwise qualified.

In *Grosso v. UPMC*, the plaintiff was diabetic and suffered from hypoglycemic unawareness syndrome. 857 F. Supp. 2d 517 (W.D. Pa. 2012). Among her other employment duties, the plaintiff was responsible for running a machine that sustained the life of a patient during surgery. *Id.* at 537. The court granted summary judgment based on a direct threat, concluding that:

> The risk would exist whenever plaintiff was working; the severity of the harm would be high, including risked loss of human life; and it is fairly likely, given plaintiff's own testimony regarding the frequency with which she loses consciousness, that plaintiff would pass out at some point in the imminent future during a bypass procedure.

*Id.* The court found that "no reasonable jury could conclude that plaintiff was not a direct threat to defendants' patients."

As to the duration factor, the Court finds it is undisputed that Anderson's Brugada Syndrome is a life-long affliction and will continue to persist in perpetuity. (ECF No. 60 at ¶ 16). This life-long risk means that Anderson could experience another syncopal episode at any time. Further, Anderson does not dispute that his ICD could misfire and that the discharge of an ICD can result in a complete loss of situation awareness. (ECF No. 60 at ¶¶ 19, 20). Therefore, the risks that a syncopal episode creates are unlimited. *See Wurzel v. Whirlpool Corp.*, No. 3:09CV498, 2010 WL 1495197, at *8 (N.D. Ohio Apr. 14, 2010), *aff'd*, 482 F. App'x 1 (6th Cir. 2012). Accordingly, the Court finds, based upon the undisputed objective evidence in the record, that the duration of the risk caused by Anderson's Brugada Syndrome and his implanted ICD supports a finding that Anderson was a direct threat.

The consideration of the nature and severity of the potential harm also leads to the conclusion that Anderson was a direct threat. While the parties dispute the exact responsibilities of a train conductor as to "driving" the train, Anderson stated during his deposition that "the conductor is responsible for the train." (ECF No. 64-1 at 49:11–12). Further, the train conductor is responsible for paperwork, working in the train yard, coupling and uncoupling train cars, communicating over the radio, "calling signals while traveling on the train," and making repairs while the train is moving. (*Id.* at 46:21–49:6). Also, the train conductor and engineer are responsible for the safe and proper management of trains weighing up to 200 tons, one mile in length, traveling up to sixty miles an hour, frequently in populated areas while carrying chemicals or other hazardous materials. (ECF No. 54 at ¶ 7). Additionally, conductor and engineer positions are recognized by the Federal Railroad Administration as safety-sensitive and, therefore, can impact their own safety, the safety of co-workers, and the safety of the public at

large. (*Id.* at ¶ 9). Should Anderson experience a syncopal episode while performing his duties as a conductor, the consequences could be catastrophic. *See Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 628 (1989) (stating that "even a momentary lapse of attention can have disastrous consequences," including "great human loss."); *Wurzel*, 2010 WL 1495197, at *8. Accordingly, the Court finds that the nature and severity of the potential harm caused by Anderson suffering a syncopal episode while discharging his duties as a conduct (or engineer) support a direct threat finding.

The Court finds that the likelihood of the potential harm occurring is significant. Determining the likelihood of the potential harm occurring "is not subject to scientific measurement. Likelihood is not the same as certainty." *Id.* However, the risks of Anderson's Brugada Syndrome, the effect of his prior syncopal episode, or the possible effects of another such episode, are not disputed, even if another syncopal episode has not yet occurred. Further, Anderson's doctor, Dr. Larkin could not rule out the possibility of Anderson experiencing symptoms, even with the ICD. (ECF No. 60 at ¶ 62). As the *Wurzel* Court stated, "[p]laintiff's argument that a future occurrence was not likely because nothing had happened in the past is off point. Should the nearsighted drive without glasses because they have yet to run into something or somebody?" 2010 WL 1495197, at *9. Accordingly, the Court finds that this factor supports a finding that Anderson's condition created a direct threat.

Finally, the imminence of the potential harm supports a direct threat finding. There is no doubt that Anderson may not have another episode. However, Anderson may experience arrythmia at any moment, and the ICD may fire or misfire, resulting in loss of consciousness or even death. Anderson argues that NSRC "merely speculates that the diagnosis of Brugada

Syndrome and the ICD itself if triggered would adversely impact Anderson's ability to perform his conductor and/or engineer position. (ECF No. 61 at 11). Further, Anderson contends that he has not had a syncopal episode since the implantation of the ICD and his cardiac function is excellent. (ECF No 60 at ¶ 62). "While the risk of injury in this case might not have been in every instance and at every moment immediate, it was sufficiently likely to occur that at any given moment it might have been imminent, as the law understands that term in this context." *Id.; see Donahue*, 224 F.3d at 232 (stating the court "must consider the evidence available when [the employer] made [the] decision, not what is known with the benefit of hindsight. When [the employer] made its decision, it knew that [the plaintiff] had twice passed out at work, and [the plaintiff's] own cardiologist had opined that [he] was at risk of passing out unexpectedly.) There is nothing speculative about the lingering threat of a syncopal episode. Accordingly, the Court finds that the potential harm is sufficiently imminent to support a direct threat finding.

In *Donahue,* the Third Circuit found that "no reasonable jury could fail to find that the evidence in the summary judgment record established that employing [plaintiff] as a train dispatcher would have presented a significant risk to others." 224 F.3d at 230–231. The Court reaches the same holding as in *Donahue* – no reasonable jury could fail to find that the ever-present, perpetual risk of Anderson suffering a syncopal episode while in charge of a massive train, traveling at high speed with hazardous cargo, is anything less than a direct threat to himself, other employees, and the public. Accordingly, the Court finds that Anderson was not otherwise qualified to perform the essential functions of his jobs as a conductor or engineer.

### 2. Anderson has not Suffered an Adverse Employment Decision as a Result of Unlawful Discrimination

NSRC also argues that Anderson cannot establish the third prong of his *prima facie* case, that he "has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul*, 134 F.3d at 580. Anderson contends that his medical disqualification from working as a conductor or engineer was an adverse employment action based on discrimination. (ECF No. 61 at 4).

"The ADA prohibits discrimination based on stereotypes (i.e., adverse action simply on the basis of the person's disabling, or perceived disabling condition). The Act does not, however, bar acting when that condition leads to harm or risk of harm." *Wurzel*, 2010 WL 1495197, at *9. In this case, it cannot be disputed that Anderson suffered an adverse employment action. However, that adverse employment action was not taken "as a result of discrimination." *Gaul*, 134 F.3d at 580. Instead, NSRC's decision to find Anderson medically unfit for his position was a result of the risks of harm created by Anderson's Brugada Syndrome and the risks of a syncopal episode occurring. As addressed above, those risks were known to NSRC and were the basis for its actions. Accordingly, the Court finds that there is no evidence supporting Anderson's contention that he suffered an adverse employment action as a result of discrimination.

### 3. NSRC's Reasons for Disqualifying Anderson from his Roles as a Conductor or Engineer were not Pretextual

Next, NSRC contends that even if Anderson had succeeded in establishing his *prima facie* case, there is no evidence that its stated reason from disqualifying Anderson – the risk of harm – was pretextual. (ECF No. 53 at 23–24). Anderson does not address this argument in his response.

"Claims of pretextual employment discrimination under the ADA follow the familiar burden-shifting paradigm outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973)." *Wolski v. City of Erie*, 773 F. Supp. 2d 577, 587 (W.D. Pa. 2011). A plaintiff can show that the stated reason for the adverse employment action was pretextual "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perske*, 32 F.3d 759, 764 (3d Cir. 1994).

Assuming that Anderson had successfully established his *prima facie* case, the Court finds that there is no genuine dispute of material fact as to pretext and, therefore, NSRC would be entitled to summary judgment. In this case, the stated reason for NSRC's action was its concerns related to Anderson's syncopal episodes. As addressed above, NSRC knew and took action based upon its concerns related to Anderson's syncopal episodes. Further, this justification was considered and governed NSRC's conduct at the time it took those actions. This is not, as Anderson suggests, a post hoc justification for discriminatory acts. Finally, Anderson does not address pretext in his response to NSRC's motion. Accordingly, the Court finds that there is no evidence in the record suggesting that NSRC's legitimate, nondiscriminatory reason was pretextual. Therefore, NSRC is entitled to summary judgment.

### 4. NSRC did not Fail to Accommodate Anderson

To successfully establish a *prima facie* case of failure to reasonably accommodate under the ADA, a plaintiff must show: "(1) he was disabled, and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438

F.3d 240, 246 (3d Cir. 2006). An employer need only provide a reasonable accommodation and is not required to provide the plaintiff's preferred or requested accommodation. *Mathew v. Cardone Industries, Inc.*, No. 97-7480, 1998 WL 376037, at * 3 (E.D. Pa. July 2, 1998). Additionally, where CBAs are involved, the United States Supreme Court has held accommodations that conflict with established CBA seniority systems are not reasonable accommodations. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 394 (2002).

In its motion, NSRC contends that there was a good faith effort to accommodate Anderson through placement in another position, and that there were no reasonable accommodations which would allow Anderson to perform the essential functions of train conductor or engineer. (ECF No. 53 at 25–30).

As to the reasonable accommodations, the Court finds that there are no identified reasonable accommodations that would allow Anderson to perform the essential functions of a train conductor or engineer. "[E]mployers are not required to modify the essential functions of a job in order to accommodate an employee." *Donahue*, 224 F.3d 226, 232 (3d Cir.2000). As addressed above, Anderson was a direct threat and could not perform the essential job functions. Anderson argues that a "whisker switch" must be hit by the engineer "in order to prevent the engine [from] engaging the brake system to stope movement of the train" and suggest this reduces the risks caused by his Brugada Syndrome. (ECF No. 61 at 2). Even if a whisker switch would help reduce some of the risks, it would not address others, such as the conductor's obligation to make repairs while the train is moving, the conductor's responsibility for the train, and the conductors obligation to call signals while on the train. (ECF No. 64-1 at 46:21–49:12). In order for Anderson to continue as a train conductor or engineer, another employee would have

to take responsibility for many of the essential functions that Anderson cannot safely perform. "Several other courts have decided that having other personnel perform some of the functions of the disabled employee is unreasonable and not required under the ADA." *Grosso*, 857 F. Supp. 2d at 539 (collecting cases). Accordingly, the Court finds that Anderson has not identified any accommodations that would allow him to perform all of the essential job functions. Therefore, the Court finds that Anderson has failed to establish this element of his failure to accommodate claim.

NSRC contends that it made a good faith effort to accommodate Anderson through finding Anderson another position within NSRC. The Third Circuit has "held that both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith." *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 330 (3d Cir. 2003) (internal quotation omitted). As set forth in the Declaration of Matthew Jones, manager of Vocational Rehabilitation Services for NSRC (ECF No. 54-3), there was an extended effort by NSRC to place Anderson into a job he was otherwise qualified for. First, when it appeared that there would be an opening, in Altoona VRS worked with Anderson to ensure he was qualified. (*Id.* at ¶¶ 8–9). Through no fault of NSRC, that position ended up not becoming available. (*Id.* at ¶ 10). Anderson then refused an otherwise available position in Pitcairn, Pennsylvania. (*Id.* at ¶ 11). Anderson further refused to consider a position in Atlanta, Georgia (*Id.* at ¶ 13). Anderson then refused a position in Shire Oaks, Pennsylvania, and lacked the seniority necessary under the CBA for a position in Baltimore, Maryland. (Id. at ¶ 14). Anderson then withdrew from consideration for another position because of his lack of seniority. (*Id.* at ¶ 17). Finally, Anderson declined consideration for another position in Atlanta, Georgia because he did not want to relocate. (*Id.* at ¶ 18). From September

19

27, 2016, through February 22, 2018, NSRC worked with Anderson to find a position he was qualified for. (*Id.* at ¶¶ 8–18).

Each time a position became available, Anderson declined because he did not wish to relocate. (*Id.*). During his deposition, Anderson stated that he had "express[ed] that it may be a last resort to relocate. [Anderson] wasn't interested in relocation, but [never] ruled it out completely." (ECF No. 60-1 at 96:6-11). Further, Anderson stated that he did not accept a position in Atlanta because he thought there were more positions available for him near Altoona, Pennsylvania. (*Id.* at 96:21–23). Anderson contends that NSRC required him to apply competitively to jobs he was otherwise qualified for. (ECF No. 61 at 13). However, he provides no specifics. Further, it is clear the VRS searched for available positions, made those available positions known to Anderson, and Anderson declined those positions because he "wasn't interested in relocating." (ECF No. 60-1 at 96:9).

NSRC did attempt to find Anderson an alternative position for which he was qualified and that fit his work restrictions and geographic preferences "for well over a year" while he participated in NSRC's VRS. *See* (ECF No. 54-3). Anderson's inability to obtain any of the alternative positions was either of his own making (his narrow geographic preferences and unwillingness to relocate), due to otherwise lawful circumstances (scheduling issues in Altoona, Pennsylvania), or due to NSRC's inability to violate the CBA for the Baltimore, Maryland position. Further, Anderson voluntarily ceased his participation in NSRC's VRS program to start his own business. Accordingly, the Court finds that there is no genuine dispute of material fact as to NSRC's good faith effort to assist Anderson and accommodate him through finding a new

position.  Therefore, Anderson's failure to accommodate claim fails and NSRC should be granted summary judgment.

**B.  NSRC's Motion to Strike**

NSRC also filed a "Motion to Strike Affidavit of Timothy Laeving" (ECF No. 62).  In its motion, NSRC contends that Anderson failed to disclose Laeving as required by Federal Rule of Civil Procedure 26 and, therefore, his affidavit (ECF No. 60-5) should be stricken.  Anderson responds that he was not required to disclose Laeving because he is a witness only for impeachment purposes.  It is unclear exactly how Anderson is attempting to use Laeving, and whether he is an impeachment witness or a fact witness as to the feasibility and effect a whisker switch could have.  Based upon this uncertainty, and because the Court has found that NSRC should be granted summary judgment, the Court denies NSRC's motion without prejudice.

**V.     Conclusion**

For the foregoing reasons, the Court finds that NSRC has established that Anderson was not otherwise qualified to perform the essential functions of train engineer and conductor because he was a direct threat to the safety of himself and others.  The Court further finds that Anderson was not subjected to adverse employment action due to unlawful discrimination.  The Court further finds that Anderson has not provided evidence from which a reasonable jury could conclude that NSRC's stated reasons for its actions were pretextual.  The Court further finds that Anderson could not be reasonably accommodated to allow him to continue working as a train conductor or engineer.   The Court further finds that NSRC made a good faith effort to accommodate Anderson and place him in another position for which he was qualified.

Accordingly, the Court will grant NSRC's motion for summary judgment, deny Anderson's motion for summary judgment, and deny NSRC's motion to strike without prejudice. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL ANDERSON,                          )          Case No. 3:18-cv-00190
                                        )
        Plaintiff,                     )          JUDGE KIM R. GIBSON
                                        )
   v.                                   )
                                        )
NORFOLK SOUTHERN RAILWAY                )
COMPANY,                                )
                                        )
        Defendant.                     )

## ORDER

**AND NOW**, this _31st_ day of March, 2021, upon consideration of "Defendant's Motion for Summary Judgment" (ECF No. 52), "Plaintiff's Motion for Partial Summary Judgment" (ECF No. 55), and "Defendant's Motion to Strike the Affidavit of Timothy Laeving" (ECF No. 62), and for the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** as follows: "Defendant's Motion for Summary Judgment" (ECF No. 52) is **GRANTED**; "Plaintiff's Motion for Partial Summary Judgment" (ECF No. 55) is **DENIED**; and Defendant's Motion to Strike the Affidavit of Timothy Laeving (ECF No. 62) is **DENIED WITHOUT PREJUDICE**.

BY THE COURT:

_____
**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**